JO ANN RICHTER, Plaintiff-Appellee and Cross-Appellant, v. STANDARD MUTUAL INSURANCE COMPANY, Defendant-Appellant and Cross-Appellee.

Fifth District   No. 5—94—0732

Opinion filed May 2, 1996.

Charles C. Compton, of Reed, Armstrong, Gorman, Coffey, Thomson, Gilbert & Mudge, P.C., of Edwardsville, for appellant.

Staci M. Yandle and Michael B. Marker, both of Carr, Korein, Tillery, Kunin, Montroy & Glass, of East St. Louis, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff, Jo Ann Richter, filed a complaint for declaratory judgment against defendant, her insurer, Standard Mutual Insurance Company, seeking a declaration that plaintiff's settlement with and execution of an unlimited release with the underinsured motorist, Dovie Vowell, and her insurer, State Farm Mutual Automobile Insurance Company (State Farm), did not prejudice defendant's subrogation rights. Defendant appeals the order of the circuit court of St. Clair County which found that defendant's subrogation rights were not prejudiced by plaintiff's release and settlement with Vowell and State Farm and, therefore, plaintiff was not barred from recovering under the underinsured motorist provisions of her insurance policy with defendant. Plaintiff cross-appeals the order of the circuit court finding that the underinsured driver had the financial ability to satisfy any judgment defendant may obtain on a potential subrogation claim under plaintiff's underinsured motorist policy.

Defendant presents a single issue for our consideration on appeal, whether plaintiff's settlement and release with the underinsured motorist and State Farm without defendant's knowledge and consent bars plaintiff's claim for underinsured motorist coverage. We affirm; accordingly, we need not resolve the issue raised in plaintiff's cross-appeal.

I

On May 25, 1989, plaintiff's vehicle was struck from the rear by a car driven by Dovie Vowell, and plaintiff sustained injuries. At the time, Vowell was insured by State Farm with bodily injury limits of $50,000 per person and $100,000 per occurrence. Plaintiff owned an automobile liability policy issued by defendant that included underinsured motorist coverage with a limit of $100,000 per person and $300,000 per occurrence.

On February 23, 1990, William M. Gibbons, claims examiner for defendant, sent a letter to Ireal Spann, claims adjuster for State Farm, indicating defendant's right of lien and subrogation arising out of plaintiff's claim against State Farm for medical expenses she incurred. Gibbons contacted Spann again, by letter dated April 16, 1991, reiterating defendant's subrogated interest in medical expense payments made to plaintiff. In the same letter, Gibbons informed Spann of plaintiff's retention of counsel and further stated that plaintiff's attorney had no right of recovery to any portion of

defendant's subrogation claim. State Farm subsequently settled the medical subrogation claim with defendant.

In the interim, on May 2, 1991, plaintiff initiated suit against Vowell seeking to recover monetary damages in excess of $15,000 for personal injuries sustained in the May 25, 1989, accident. Defendant was informed of the complaint filed in the circuit court of St. Clair County in a letter from plaintiff's attorney dated January 30, 1992, in which plaintiff's counsel notified defendant that plaintiff's damages could exceed Vowell's policy limits of $50,000. Plaintiff's attorney requested information regarding plaintiff's underinsured motorist coverage in effect on the date of the accident, her policy limits, a copy of her policy, and "any other information with respect to proceeding on an underinsured motorist claim on plaintiff's behalf." Gibbons responded to plaintiff's counsel's request in a letter dated February 6, 1992, in which Gibbons stated that plaintiff's policy included underinsured motorist coverage for bodily injury of $100,000 per person, with an aggregate limit of $300,000 for each occurrence. Gibbons further explained that defendant would deduct the $50,000 plaintiff could recover from the tortfeasor from her underinsured motorist coverage. Additionally, Gibbons requested a copy of the complaint plaintiff filed against Vowell. Plaintiff's attorney, on February 11, 1992, sent Gibbons the requested medical records and a copy of the complaint. On March 10, 1992, Joe Macklin, liability supervisor for defendant, sent a fax to plaintiff's attorney, acknowledging plaintiff's likely underinsured motorist claim and requesting a current address for Vowell. As of March 10, 1992, there was no mention of settlement negotiations between plaintiff and State Farm in any correspondence between plaintiff's attorney and defendant.

On April 8, 1992, Michael Constance, the attorney for State Farm, sent a letter to Spann, stating that he had "spoken to plaintiff's counsel several times and because of the potential underinsured motorist exposure and because of the high medical bills plaintiff would not accept less than $50,000." Constance then requested that State Farm forward him a check in that amount for plaintiff and her attorneys. Constance further indicated that he would prepare the release for plaintiff's signature. Plaintiff signed the release of claims on April 23, 1992. Plaintiff received two checks from State Farm in the sum of $49,074.90 and $925.10. The draft for $925.10 represented defendant's medical payments to plaintiff. On April 28, 1992, plaintiff's counsel sent a letter to defendant informing it of plaintiff's settlement of her claim against Vowell and demanding settlement of her underinsured motorist claim in the amount of $50,000. A copy of the stipulation for dismissal of the lawsuit plaintiff intended to file with the court was included.

On May 1, 1992, Macklin sent a memo to Gibbons indicating that defendant had not received prior notification of the settlement between plaintiff, Vowell, and State Farm and that defendant had not approved the settlement. Macklin also stated that the file did not evidence any agreement to waive defendant's subrogation rights against Vowell. Based on the information on file, Macklin determined that plaintiff was barred from recovery under the underinsured motorist coverage of the policy because she failed to notify defendant and obtain its consent before entering into the settlement.

Macklin prepared a draft "denial" letter to be sent to plaintiff's attorney stating that plaintiff lost the benefit of her underinsured motorist coverage because she failed to give defendant advance notice of the settlement with the tortfeasor, thereby prejudicing the company's subrogation right. On May 7, 1992, Macklin sent a memo and the "denial" letter to Maurice Kepner, defendant's attorney. Macklin wanted Kepner to review the "denial" letter to make sure that "all of [the] i's are dotted and t's are crossed" so that the company would not be estopped from asserting the "loss of subrogation rights" defense. On May 11, 1992, Kepner sent the denial letter to plaintiff's attorney.

On July 30, 1992, plaintiff filed a complaint for declaratory judgment against defendant seeking a declaration that her settlement with Vowell did not prejudice defendant's subrogation rights and, therefore, plaintiff had not lost the benefit of the underinsured motorist coverage in her policy. On March 8, 1994, a hearing was held on plaintiff's motion for declaratory judgment.

At the March 8, 1994, hearing, on direct examination, Spann read to the court the letter from Constance dated April 8, 1992, in which Constance informed Spann that plaintiff's attorney refused to accept less than the full amount of Vowell's liability coverage ($50,000) due to plaintiff's potential underinsured motorist coverage in addition to the extensive medical bills plaintiff incurred. When asked by plaintiff's counsel what conclusions, if any, Spann drew from that part of the letter referencing the potential underinsured motorist exposure, the following exchange occurred:

"A. Well, that would mean to me that Miss Richter intended to pursue an underinsured claim against her company.

Q. Okay. And at that time, did you know who her company was?

A. Yes.

Q. And who was that?

A. Standard Mutual Insurance Company."

On cross-examination, Spann testified that at the time of the let-

ter he did not know who provided plaintiff's underinsured motorist coverage. However, Spann testified later, on redirect, that he assumed defendant was the carrier of plaintiff's underinsured motorist coverage since defendant had filed a lien for repayment of their medical payments to plaintiff.

Macklin was called as an adverse witness for plaintiff. Macklin testified that he requested information regarding Vowell in his fax to plaintiff's attorney dated March 10, 1992, because "we had been presented with a potential underinsured motorist bodily injury claim." Macklin stated that he requested the information so that defendant could do an assets check on Vowell "to see when we got to the position where and if State's Farm's limit was tendered, we would have the information available to us to waive or preserve our subrogation rights." When asked on direct examination what decision defendant made regarding preservation of its subrogation rights with respect to Vowell, Macklin stated that no decision regarding defendant's subrogation rights could be made until defendant was notified that State Farm had tendered its limit.

On September 22, 1994, the circuit court entered its order finding that plaintiff's signing of a general release did not prejudice defendant's right of subrogation because the release did not specifically include an amount designated as covering defendant's subrogation rights. The circuit court further found that Vowell's insurance company and her attorney had sufficient knowledge regarding plaintiff's intent to pursue an underinsured motorist claim against her insurance carrier so as to preserve defendant's subrogation rights against Vowell despite the release plaintiff signed. Additionally, the court found that defendant, upon learning of the dismissal, could have filed a petition to intervene and to set aside the order of dismissal; however, defendant failed to take the appropriate action to safeguard its subrogation rights against Vowell. The court concluded that defendant was not prejudiced by plaintiff's failure to notify defendant of her settlement with Vowell such that plaintiff forfeited her right to pursue a claim under the underinsured motorist coverage of her policy. Defendant appeals.

## II

Defendant contends that its subrogation rights were prejudiced by plaintiff's signing of a general release in favor of Vowell because plaintiff failed to notify defendant of her intent to settle her claims against Vowell and Vowell's insurer, State Farm. Defendant asserts that a provision in the policy issued to plaintiff excludes claims against the underinsured motorist provisions where an "insured, his

legal representative or any person entitled to payment under this coverage shall, without written consent of the Company, make any settlement with any person or organization who may be legally liable therefor." The provision also states that "the Company shall be subrogated to all the insured rights of recovery" and that "the insured shall do nothing after loss to prejudice such rights." Defendant claims that, by executing the release, plaintiff prejudiced its subrogation claim against the underinsured motorist. Further, defendant argues that plaintiff is properly barred from the policy's underinsured motorist coverage because coverage under this provision does not apply if the insured settles with any party who is potentially legally liable without first obtaining defendant's written consent. We disagree.

■ Our supreme court in *Home Insurance Co. v. Hertz Corp.*, 71 Ill. 2d 210, 375 N.E.2d 115 (1978), set forth the rule:

"[A]n unlimited release executed by an insured-subrogor for consideration not specifically including an amount designated as covering the insurer's subrogation interest *does not bar* a subsequent subrogation action by an insurer-subrogee against the tortfeasor, if the tortfeasor or his insurance carrier had knowledge of the insurer-subrogee's interest prior to the release." (Emphasis added.) 71 Ill. 2d at 215, 375 N.E.2d at 118.

■ Crucial to the disposition of this case is whether State Farm or Vowell had notice of defendant's subrogation rights. The facts indicate that Spann, claims adjuster for State Farm, received a letter from the attorney for State Farm regarding his discussions with plaintiff's attorney concerning plaintiff's reluctance to settle for less than Vowell's policy limits "because of the potential underinsured motorists exposure." At the hearing on plaintiff's motion for declaratory judgment, Spann testified that he read the letter to mean that plaintiff intended to pursue an underinsured motorist claim against her insurer. Spann further testified that while he did not know exactly who provided plaintiff's underinsured motorist coverage, he assumed defendant was the carrier since defendant had filed a lien for repayment of defendant's medical payments to plaintiff. The record does not indicate that plaintiff had any other insurance policies relevant to the accident here. Defendant was the only insurer that had dealings with Spann concerning this occurrence. Therefore, no other inference can be drawn from the letter. Additionally, it is common practice for insurance companies to include subrogation provisions in standard automobile insurance policies. In light of the letter to Spann, coupled with defendant's securing its subrogation rights against State Farm for plaintiff's medical expenses, we conclude that

State Farm had notice of defendant's subrogation interest. Further, the release plaintiff signed did not include an amount designated as covering defendant's subrogation interest. Accordingly, defendant's subrogation rights survived the settlement between plaintiff and Vowell and State Farm. Consequently, defendant's subrogation interest was not prejudiced by the settlement.

Defendant cites *Standard Mutual Insurance Co. v. Petreikis*, 183 Ill. App. 3d 272, 538 N.E.2d 1327 (1989), as directly on point and dispositive of the issues presented here. However, *Petreikis* is distinguishable. In *Petreikis*, the insurer indicated to the insured that the insurer should be supplied with the primary carrier's policy limits once the primary carrier had tendered those limits. The court found that this was not a sufficient basis for the insured to settle with the primary carrier without further contact with the insurer. In the instant case, however, defendant insurer was fully and timely informed of the pending settlement but chose not to act. The *Petreikis* court cited with approval the following concerning estoppel:

> " 'Where a person stands by and sees another about to commit, or in the course of committing, an act infringing on his rights and fails to assert his title or right, he will be estopped afterward to assert it.' (18 Ill. L. & Prac. *Estoppel* § 30, at 102 (1956).)" *Petreikis*, 183 Ill. App. 3d at 283, 538 N.E.2d at 1334.

The court concluded:

> "The facts do not necessarily indicate conduct on the plaintiff's part inducing defendants to act to their detriment, nor do they indicate plaintiff stood by, without giving warning, while seeing defendants about to commit an act detrimental to the plaintiff's interest." *Petreikis*, 183 Ill. App. 3d at 283, 538 N.E.2d at 1334.

The instant case is the exact opposite; the defendant insurer stood by, having been given warning, while seeing plaintiff insured commit an act defendant now claims was detrimental to its interest. *Petreikis* supports the decision of the trial court and the decision reached by this court.

Defendant next argues that it properly denied coverage to plaintiff pursuant to the exclusion provision, which provides that the policy does not apply under the underinsured motorist coverage when the insured settles a claim without first obtaining defendant's written consent. We disagree.

■ "It is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy." *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 204, 579 N.E.2d 322, 333 (1991). Once the insured has brought himself within the terms of his policy, the

insurer attempting to limit liability by excluding coverage under certain circumstances must affirmatively demonstrate the applicability of the policy exclusion. *State Farm Mutual Automobile Insurance Co. v. Schmitt*, 94 Ill. App. 3d 1062, 1064-65, 419 N.E.2d 601, 603 (1981).

■ While the record is unclear regarding the initial contact between plaintiff's attorney and defendant, it is clear that as early as February 23, 1990, defendant was aware that plaintiff had retained counsel. Gibbons, defendant's claims examiner, in a letter to Spann of State Farm on February 23, 1990, acknowledged plaintiff's retention of counsel and informed State Farm that plaintiff's attorney had no right of recovery to any portion of defendant's medical subrogation claim. On January 30, 1992, plaintiff's counsel sent defendant a letter notifying it of the complaint filed on plaintiff's behalf against Vowell and informing defendant that plaintiff's damages could exceed Vowell's policy limit of $50,000. In the same letter, plaintiff's attorney requested information regarding plaintiff's underinsured motorist coverage in effect on the date of the accident, her policy limits, a copy of her policy, and "any other information with respect to proceeding on an underinsured motorist claim on plaintiff's behalf," clearly indicating that plaintiff intended to make a claim under these provisions of her policy. Gibbons, in a letter dated February 6, 1992, requested a copy of the complaint plaintiff filed against Vowell and forwarded to plaintiff's counsel the requested information. Plaintiff's counsel promptly sent Gibbons a copy of the complaint along with the requested medical records. Additionally, on March 10, 1992, Macklin sent a fax to plaintiff's attorney, acknowledging plaintiff's likely underinsured motorist claim and requesting a current address for Vowell. On April 28, 1992, plaintiff's attorney sent a letter to defendant, informing it of plaintiff's settlement claim against Vowell and demanding settlement of her underinsured motorist claim.

As demonstrated by the record, defendant had ample notice of an impending settlement between plaintiff, Vowell, and State Farm. When defendant first received a copy of plaintiff's complaint against Vowell, it could have sent a lien letter to State Farm in order to protect its subrogation rights, as it did with respect to the medical payments made to plaintiff. Further, the correspondence between defendant and plaintiff's attorney clearly indicates that plaintiff intended to make a claim against the underinsured motorist coverage of her policy, which would require State Farm to settle for the full extent of Vowell's policy limits. Defendant's policy provided, under "PART IV— PROTECTION AGAINST UNINSURED MOTORISTS":

"3. Underinsured Motorists Insurance is included subject to the following:

(a) ***

The company shall not be obligated to make any payment because of bodily injury to which this insurance applies until *after the limits of liability* under all bodily injury liability bonds or insurance policies applicable at the time of the accident have been exhausted by payment of judgments or settlements." (Emphasis added.)

The complaint against Vowell and particularly the correspondence between defendant and plaintiff's attorney regarding plaintiff's underinsured motorist coverage show that defendant had sufficient notice to prompt it, at the very least, to make further inquiries regarding plaintiff's suit against Vowell in order to protect its subrogation rights. In light of these facts, defendant can hardly contend it had no prior notice that plaintiff intended to settle her claim against Vowell until it received the demand letter from plaintiff's attorney on April 28, 1992. Moreover, defendant cannot deny plaintiff coverage under the policy pursuant to its exclusion clause when it is defendant who failed to take the appropriate steps to secure its rights. Accordingly, we conclude that defendant improperly denied plaintiff's claim for underinsured motorist coverage.

### III

Finally, defendant asserts that because it received notice of plaintiff's settlement on April 30, 1992, the day the dismissal order was to be entered, it had insufficient time to take any action to prevent entry of the dismissal order. Defendant further maintains that since its subrogation rights were prejudiced by plaintiff's execution of the release, defendant is relieved of having to take "extraordinary" steps to resurrect those rights. We disagree.

■ Section 2—408(a)(2) of the Code of Civil Procedure (Code) provides that anyone has a right to intervene in a particular action when "the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action." 735 ILCS 5/2—408(a)(2) (West 1992). An intervenor only needs to show an injury to an enforceable right or interest which is more than a general interest in the subject matter of the suit. *Serio v. Equitable Life Assurance*, 184 Ill. App. 3d 432, 435-36, 540 N.E.2d 800, 802 (1989). While usually permitted only before judgment, intervention will be granted after judgment where it is the only way to protect the rights of the intervenor. *Wheeling Trust & Savings Bank v. Village of Mount Prospect*, 29 Ill. App. 3d 539, 541, 331 N.E.2d 172, 174 (1975).

Defendant claims that it first learned of the settlement on April 30, 1992, the same day the settlement was entered by the trial court. Upon learning of the dismissal, defendant made no attempt to contact plaintiff's attorney or to take any legal action to protect its subrogation rights against Vowell. Instead, defendant set about determining a manner in which to deny plaintiff recovery under the underinsured motorist provisions of the policy.

■ To justify its course of action, defendant contends that it is not required to take any "extraordinary" action to protect its subrogation rights because it is plaintiff's obligation to "do nothing after loss to prejudice such rights." Defendant's argument is flawed on two accounts: first, plaintiff's signing of the release did not prejudice defendant's subrogation rights because the release did not specifically designate an amount for covering defendant's subrogation interest, and second, in the event defendant was uncertain as to the effects of the release on its rights, it would be incumbent upon defendant to take steps to safeguard its rights, especially because it might be bound by any resulting order or judgment. Filing a petition to intervene can hardly be termed an "extraordinary" step to preserve defendant's interest. Further, as an intervenor, defendant would be entitled to all the rights of an original party, including the right to seek postjudgment relief pursuant to section 2—1401 of the Code. 735 ILCS 5/2—1401 (West 1992).

Regarding section 2—1401 relief, defendant contends that its subrogation claim was extinguished upon execution of the release and, consequently, it would be futile for defendant to seek section 2—1401 relief. However, as discussed above, defendant's subrogation rights were not barred by the release; therefore, defendant would have a viable claim against Vowell for the setting aside of the dismissal order. Accordingly, we find that the trial court, in light of the circumstances here, properly concluded that defendant's subrogation rights were not prejudiced by plaintiff's execution of the release of claims against Vowell such that plaintiff forfeited her coverage under the underinsured motorist provision of her policy with defendant.

In light of our disposition of defendant's appeal, it is unnecessary for us to address the issue raised in plaintiff's cross-appeal.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

HOPKINS, P.J., and RARICK, J., concur.